## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CHAPTER 4 CORP., | |
| Plaintiff, | Case No. 19-cv-07931 |
| v. | |
| THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A," | |
| Defendants. | |

## COMPLAINT

Plaintiff Chapter 4 Corp. ("Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

### I. JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.  This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, commercial Internet stores operating under the Defendant Domain

Names and/or the Online Marketplace Accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Defendant Internet Stores through which Illinois residents can purchase products using infringing and counterfeit versions of Plaintiff's trademarks. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products using infringing and counterfeit versions of Plaintiff's trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

## II. INTRODUCTION

3.     This action has been filed by Plaintiff to combat Internet Store operators who trade upon Plaintiff's reputation and goodwill by selling and/or offering for sale unauthorized and unlicensed products, including clothing, hats, accessories and other goods, using infringing and counterfeit versions of the SUPREME federally registered trademarks (the "Counterfeit SUPREME Products"). The Defendants create the Defendant Internet Stores by the dozens and design them to appear to be selling genuine products, while actually selling Counterfeit SUPREME Products to unknowing consumers, and/or selling Counterfeit SUPREME Products advertised as "replica" goods. Many of the Defendant Internet Stores share unique identifiers, such as design elements and similarities of the Counterfeit SUPREME Products offered for sale, establishing a logical relationship between them and suggesting that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and/or the full

2

scope and interworking of their counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit SUPREME Products over the Internet. Plaintiff has been and continues to be irreparably damaged through consumer confusion, dilution, and tarnishment of its valuable trademarks as a result of Defendants' actions and seeks injunctive and monetary relief.

### III. THE PARTIES

**Plaintiff**

4.      Chapter 4 Corp. is a New York corporation with a principal place of business at 62 King Street, New York, New York 10014.

5.      Plaintiff is an apparel company that was started in 1994 in downtown New York City, specializing in the sale of streetwear and downtown, counter-culture clothing and a wide range of other products displaying the SUPREME mark. The Supreme brand quickly developed a following among skaters, graffiti artists, underground filmmakers, and musicians.

6.      In August 2017, *Vogue* chronicled the history of Supreme in an article entitled "Charting the Rise of Supreme, From Cult Skate Shop to Fashion Superpower," and noted that "a brand that started out in a small store . . . has since inched its way to legendary global status" and that "the passionate devotion of their customers has brought it into the conversation with both teenagers at skateboard parks and the front rows of high fashion . . ." Attached hereto as **Exhibit 1** is a true and correct copy of the *Vogue* article.

7.       Plaintiff carefully plans and curates in design collections each season to provide its customers with unique apparel and products.

3

8. Plaintiff's clothing and accessories (the "SUPREME Products") are inspired by youth culture and style that appeal not only to its traditional customer base, but also to the consuming public at large.

9. Plaintiff has worked with groundbreaking designers, artists, photographers and musicians on several collaborations, including skateboard decks by artists such as Takashi Murakami, Jeff Koons, Richard Prince, Christopher Wool, Nate Lowman, and Damien Hirst. Working with generations of artists, photographers, designers, musicians, filmmakers, and writers that have defied conventions has contributed to Plaintiff's unique identity and consumer following.

10. Plaintiff has also partnered with many prominent global brands in highly publicized collaborations, including those with Louis Vuitton Malletier, Nike/Air Jordan, The North Face, Levi's, Timberland, Comme des Garçons, and Lacoste.

11. The wide appeal of SUPREME Products has frequently been commented upon by the media, including its popularity among notable musicians, athletes, and entertainers. As *Vogue* noted in another 2017 article, "[w]hen it comes to brand loyalty, Supreme fans are hard to beat" and "its streetwise perspective has served as a fashion unifier . . . its [products] beloved by men and women on opposite ends of the fashion spectrum." Attached hereto as **Exhibit 2** is a true and correct copy of the *Vogue* article.

12. SUPREME PRODUCTS and their design have also been recognized in other segments of the broader culture, including the art world. Plaintiff's iconic Box Logo trademark,



, appearing on a plain white Hanes® t-shirt was recently accepted into the Museum of Modern Art ("MoMA") permanent collection. In Spring 2018, the Thyssen Bornemisza Museum in Madrid, Spain also displayed in a Louis Vuitton "Time Capsule" exhibition a co-branded SUPREME and Louis Vuitton skateboard case.

13. SUPREME Products have become collector's items. Indeed, at the "C.R.E.A.M.: - Cash Rules Everything Around Me" auction at Artcurial in Paris, billed as the first street culture auction by a traditional auction house, approximately two thirds of the auction items were SUPREME Products, and "[p]redictably the brand's distinctive red and white logo-bedecked products created the most excitement at auction, with a punching bag going for €20,150, a Fender guitar for €5,200 and a three-foot by one-foot painted sign for €54,600, eight times its estimated price." **Exhibit 3** attached hereto is a *New York Times* article titled "Supreme Invades the Auction House" about the auction.

14. The August 13, 2018 *New York Post* issue featured a cover advertisement featuring Plaintiff's iconic Box Logo trademark. The *New York Post* dressed its entire newsstand run in a full wraparound cover with Plaintiff's Box Logo trademark, which was the first time it had done so for any brand. The partnership was referred to as "historic:" "Here we have the most New York fashion brand covering the most New York paper." The "dramatic cover ad" "turned today's tabloid into an impossible to find commodity," and by mid-morning, copies were reselling on eBay and resale fashion sites. **Exhibit 4** attached hereto is a *New York Times* article titled "Today's Supreme Drop Is All Over the New York Post" about the Supreme/*New York Post* event.

15. SUPREME Products have become enormously popular and even iconic, driven by the brand's arduous quality standards and innovative design. Among the purchasing public, genuine SUPREME Products are instantly recognizable as such.

16. SUPREME Products are of high quality and are produced in limited runs to ensure that high quality. SUPREME Products are predominately made in North America and are sold exclusively through Plaintiff's website supremenewyork.com, including to Illinois residents, and through company-owned stores located in the United States, Europe and Japan. The recognition

5

of Supreme as a business providing high quality and innovative products has been confirmed by the foremost fashion and accessory designer trade association in the United States, the Council of Fashion Designers of America, Inc. (CFDA), which awarded the company the 2018 Menswear Designer of the Year award.

17.     Plaintiff incorporates distinctive marks in the design of its various SUPREME Products.  Plaintiff uses its trademarks in connection with the marketing of its SUPREME Products, and is the exclusive owner of numerous federally-registered trademarks, including the following marks which are collectively referred to as the "SUPREME Trademarks."

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 4,157,110 | SUPREME | For:  Clothing, namely, shirts, t-shirts, long-sleeved shirts, under shirts, polo shirts, rugby shirts, jerseys, dress shirts, denim jeans, hooded sweat shirts, warm-up suits, snow suits, parkas, cardigans, pants, jean jackets, cargo pants, shorts, boxer shorts, tops, tank tops, sweat shirts, sweat jackets, sweat shorts, sweat pants, sweaters, vests, fleece vests, pullovers, jackets, coats, blazers, suits, turtlenecks, reversible jackets, wind-resistant jackets, shell jackets, sports jackets, golf and ski jackets, heavy coats, over coats, top coats, swimwear, beachwear, visors, headbands, ear muffs, thermal underwear, long underwear, underclothes, caps, hats, knit caps, headwear, scarves, bandanas, belts, neckwear, ties, robes, gloves, boots, rainwear, footwear, shoes and sneakers in class 025. |
| 4,240,456 | SUPREME | For:  skateboard decks in class 028. |

| | | |
|---|---|---|
| 5,135,326 | SUPREME | For: Retail stores, on-line ordering services and on-line retail store services, and retail store services available through computer communications, featuring clothing, footwear, headwear, bags, wallets and skateboard decks in class 035. |
| 5,066,669 | SUPREME | For: All-purpose sports and athletic bags; duffel and travel bags; fanny packs and waist packs; backpacks; knapsacks; wallets in class 018. |
| 5,775,727 | SUPREME | For: Book, carry-on, gym, shoulder and tote bags; satchels; luggage; luggage tags; trunks; suitcases; bags sold empty; men's clutches; business card cases; calling and credit card cases; key cases; leather key chains; billfolds; umbrellas in class 018. |
| 4,504,231 |  | For: Clothing, namely, shirts, t-shirts, long-sleeved shirts, under shirts, polo shirts, rugby shirts, jerseys, dress shirts, denim jeans, hooded sweat shirts, warm-up suits, snow suits, parkas, cardigans, pants, jean jackets, cargo pants, shorts, boxer shorts, tops, tank tops, sweat shirts, sweat jackets, sweat shorts, sweat pants, sweaters, vests, fleece vests, pullovers, jackets, coats, blazers, suits, turtlenecks, reversible jackets, wind-resistant jackets, shell jackets, sports jackets, golf and ski jackets, heavy coats, over coats, top coats, swimwear, beachwear, visors, headbands, ear muffs, thermal underwear, long underwear, underclothes, caps, hats, knit caps, headwear, scarves, bandanas, belts, neckwear, ties, robes, gloves, boots, rainwear, footwear, shoes and sneakers in class 025. |

| 4,554,309 | Supreme | For: skateboard decks in class 028. |
|---|---|---|
| 5,135,327 | Supreme | For: Retail stores, on-line ordering services and on-line retail store services, and retail store services available through computer communications, featuring clothing, footwear, headwear, bags, wallets and skateboard decks in class 035. |
| 5,066,670 | Supreme | For: All-purpose sports and athletic bags; duffel and travel bags; fanny packs and waist packs; backpacks; knapsacks; wallets in class 018. |
| 5,763,658 | Supreme | For: Book, carry-on, gym, shoulder and tote bags; satchels; luggage; luggage tags; trunks; suitcases; bags sold empty; men's clutches; business card cases; calling and credit card cases; key cases; leather key chains; billfolds; umbrellas in class 018. |
| 5,801,848 | Supreme | For: Eyewear; sunglasses; spectacles; sports eyewear; frames, lenses, cases, chains, cords and head straps for eyewear, sunglasses, spectacles and sports eyewear; sports goggles; cases for mobile phones; cell phone backplates; cell phone cases; cell phone covers; cell phone faceplates; cell phone straps; downloadable graphics for mobile phones; vinyl covers specially adapted for cell phones, MP3 players, laptops, computers, portable satellite radios, personal digital assistants, remote controls, and television satellite recorders in class 009. |

| | | |
|---|---|---|
| 5,592,852 |  | For: Clothing, namely, shirts, t-shirts, tank tops, sweat shirts, long-sleeved shirts, under shirts, denim jeans, hooded sweat shirts, boxer shorts, tops, sweat jackets, sweat shorts, sweat pants, sweaters, long underwear, underclothes, caps, hats, knit caps, headwear, footwear, shoes and sneakers in class 025. |

18.     The above U.S. registrations for the SUPREME Trademarks are valid, subsisting, in full force and effect, and some are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the SUPREME Trademarks constitute *prima facie* evidence of their validity and of Plaintiff's exclusive right to use the SUPREME Trademarks pursuant to 15 U.S.C. § 1057 (b). True and correct copies of the United States Registration Certificates for the above-listed SUPREME Trademarks are attached hereto as **Exhibit 5**.

19.     The SUPREME Trademarks are distinctive when applied to the SUPREME Products, signifying to the purchaser that the products come from Plaintiff and are manufactured to Plaintiff's exacting quality standards. Whether Plaintiff manufactures the products itself or contracts with others to do so, Plaintiff has ensured that products bearing the SUPREME Trademarks are manufactured to the highest quality standards.

20.     The SUPREME Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1), and have been continuously used and never abandoned. The widespread fame, outstanding reputation, and significant goodwill associated with the Supreme brand have made the SUPREME Trademarks valuable assets of Plaintiff.

21.     Through its collaborative efforts in the creation of unique and trend-setting styles, as well as Plaintiff's substantial investment in the design, marketing and promotion of its products, the SUPREME Trademarks have become well-known for high quality, style and authenticity.

22.     Since at least as early as 2006, genuine SUPREME Products have been promoted at the official supremenewyork.com website. Sales of SUPREME Products via the supremenewyork.com website are significant. The supremenewyork.com website features proprietary content, images and designs exclusive to the Supreme brand.

23.     Between 2017-2018 alone, Plaintiff's website at supremenewyork.com received billions of hits. Additionally, Plaintiff maintains an Instagram profile, @supremenewyork, that has over 13 million followers, and a Facebook page that has over 2 million followers. SUPREME Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs. As a result, products bearing the SUPREME Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from Plaintiff. SUPREME Products have become among the most popular of their kind in the U.S. and the world. The SUPREME Trademarks have achieved tremendous fame and recognition which has only added to the distinctiveness of the marks. As such, the goodwill associated with the SUPREME Trademarks is of incalculable and inestimable value to Plaintiff.

**The Defendants**

24.     Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within the State of Illinois and this Judicial District, through the operation of the fully interactive, commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell, and, on information and belief, has sold and

continues to sell Counterfeit SUPREME Products to consumers within the United States, including the State of Illinois.

25.     On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products using infringing and counterfeit versions of the SUPREME Trademarks in the same transaction, occurrence, or series of transactions or occurrences.  Tactics used by Defendants to conceal their identities and the full scope of their counterfeiting operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their counterfeit network.  In the event that Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

26.     The success of the Supreme brand has resulted in its significant counterfeiting. Consequently, Plaintiff has a worldwide anti-counterfeiting program and regularly investigates suspicious websites and online marketplace listings identified in proactive Internet sweeps and reported by consumers.  In recent years, Plaintiff has identified hundreds of domain names linked to fully interactive websites and marketplace listings on platforms such as iOffer, eBay, AliExpress, Alibaba, Amazon, Wish.com, and Dhgate, including the Defendant Internet Stores, which were offering for sale and selling Counterfeit SUPREME Products to consumers in this Judicial District and throughout the United States.  Despite Plaintiff's enforcement efforts, Defendants have persisted in creating the Defendant Internet Stores.  E-commerce sales, including through Internet stores like those of Defendants, have resulted in a sharp increase in the shipment of unauthorized products into the United States.  **Exhibit 6**, Excerpts from Fiscal Year 2018 U.S. Customs and Border Protection ("CBP") Intellectual Property Seizure Statistics Report.  Over

90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers). *Id.* Over 85% of CBP seizures originated from mainland China and Hong Kong. *Id.* Counterfeit and pirated products account for billions in economic losses, resulting in tens of thousands of lost jobs for legitimate businesses and broader economic losses, including lost tax revenue.

27. Defendants often facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers, and/or advertise their products as "replica" goods. These Defendant Internet Stores appear sophisticated and accept payment in U.S. dollars via credit cards, Alipay, Amazon Pay, Western Union and/or PayPal. The Defendant Internet Stores frequently include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Defendants further perpetuate the illusion of legitimacy by offering customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the Visa®, MasterCard®, and/or PayPal® logos. Plaintiff has not licensed or authorized Defendants to use any of the SUPREME Trademarks, and none of the Defendants are authorized retailers of genuine SUPREME Products.

28. Many Defendants also deceive unknowing consumers by using the SUPREME Trademarks without authorization within the content, text, and/or meta tags of their websites in order to attract consumers searching for genuine SUPREME Products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine SUPREME Products. Other Defendants only show the SUPREME Trademarks in product images while using

12

strategic item titles and descriptions that will trigger their listings when consumers are searching for genuine SUPREME Products.

29.     Defendants often go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their network of Defendant Internet Stores. For example, certain of Defendants' names and physical addresses used to register the Defendant Domain Names are incomplete, contain randomly typed letters, or fail to include cities or states. Other Defendant Domain Names use privacy services that conceal the owners' identity and contact information. On information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

30.     Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores. For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names. In addition, Counterfeit SUPREME Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit SUPREME Products were manufactured by and come from a common source and that Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or

similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, similar hosting services, similar name servers, and the use of the same text and images.

31.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts.  For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit.  Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received.  Rogue servers are notorious for ignoring take down demands sent by brand owners.  Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

32.     Further, counterfeiters such as Defendants typically operate multiple credit card merchant accounts and PayPal accounts behind layers of payment gateways so that they can continue operation in spite of Plaintiff's enforcement efforts.  On information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts or other financial accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based PayPal accounts to offshore bank accounts outside the jurisdiction of this Court.

33.     Defendants, without any authorization or license from Plaintiff, have knowingly and willfully used and continue to use the SUPREME Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit SUPREME Products into the United States and Illinois over the Internet.  Each Defendant Internet Store offers shipping to the

United States, including Illinois, and, on information and belief, each Defendant has sold Counterfeit SUPREME Products into the United States, including Illinois.

34.     Defendants' unauthorized use of the SUPREME Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit SUPREME Products, including the sale of Counterfeit SUPREME Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

35.     Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 34.

36.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered SUPREME Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.  The SUPREME Trademarks are highly distinctive marks.  Consumers have come to expect the highest quality from SUPREME Products offered, sold or marketed under the SUPREME Trademarks.

37.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the SUPREME Trademarks without Plaintiff's permission.

38.     Plaintiff is the exclusive owner of the SUPREME Trademarks.  Plaintiff's United States Registrations for the SUPREME Trademarks (Exhibit 5) are in full force and effect.  Upon information and belief, Defendants have knowledge of Plaintiff's rights in the SUPREME Trademarks, and are willfully infringing and intentionally using counterfeit versions of the

15

SUPREME Trademarks. Defendants' willful, intentional and unauthorized use of the SUPREME Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit SUPREME Products among the general public.

39. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

40. Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of the SUPREME Trademarks.

41. The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit SUPREME Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

42. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 41.

43. Defendants' promotion, marketing, offering for sale, and sale of Counterfeit SUPREME Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' Counterfeit SUPREME Products by Plaintiff.

44. By using the SUPREME Trademarks on the Counterfeit SUPREME Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit SUPREME Products.

16

45. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit SUPREME Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

46. Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the associated goodwill of the Supreme brand.

## COUNT III
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS § 510, *et seq.*)

47. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 46.

48. Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their Counterfeit SUPREME Products as those of Plaintiff, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine SUPREME Products, representing that their products have Plaintiff's approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

49. The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq*.

50. Plaintiff has no adequate remedy at law, and Defendants' conduct has caused Plaintiff to suffer damage to its reputation and goodwill. Unless enjoined by the Court, Plaintiff will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using the SUPREME Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine SUPREME Product or is not authorized by Plaintiff to be sold in connection with the SUPREME Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine SUPREME Product or any other product produced by Plaintiff, that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the SUPREME Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit SUPREME Products are those sold under the authorization, control or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

   d. further infringing the SUPREME Trademarks and damaging Plaintiff's goodwill; and

   e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any of Plaintiff's trademarks, including the SUPREME Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof;

2) Entry of an Order that, at Plaintiff's choosing, the registrant of the Defendant Domain Names shall be changed from the current registrant to Plaintiff, and that the domain name registries for the Defendant Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Plaintiff's selection, and that the domain name registrars, including, but not limited to, GoDaddy Operating Company, LLC ("GoDaddy"), Name.com, PDR LTD. d/b/a PublicDomainRegistry.com ("PDR"), and Namecheap Inc. ("Namecheap"), shall take any steps necessary to transfer the Defendant Domain Names to a registrar account of Plaintiff's selection; or that the same domain name registries shall disable the Defendant Domain Names and make them inactive and untransferable;

3) Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including, without limitation, any online marketplace platforms such as iOffer, eBay, AliExpress, Alibaba, Amazon, Wish.com, and Dhgate, web hosts, sponsored search engine or ad-word providers, credit cards, banks, merchant account providers, third party processors and other payment processing service providers, Internet search engines such as Google, Bing and Yahoo, and domain name registrars, including, but not limited to, GoDaddy, Name.com, PDR, and Namecheap, (collectively, the "Third Party Providers") shall:

    a. disable and cease providing services being used by Defendants, currently or in the future, to engage in the sale of goods using the SUPREME Trademarks;

    b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the SUPREME Trademarks; and

c. take all steps necessary to prevent links to the Defendant Domain Names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index;

4) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the SUPREME Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Plaintiff be awarded maximum statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) for each and every use of the SUPREME Trademarks;

6) That Plaintiff be awarded its reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

Dated this 3rd day of December 2019.          Respectfully submitted,


/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Allyson M. Martin
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
amartin@gbc.law

*Counsel for Plaintiff Chapter 4 Corp.*

20